51 A.3d 119

C.A., A MINOR, BY HER MOTHER AND GUARDIAN AD LITEM,
ESTHER APPLEGRAD, ESTHER APPLEGRAD, INDIVIDUAL-
LY, AND GEDALIA APPLEGRAD, INDIVIDUALLY, PLAIN-
TIFFS–APPELLANTS/CROSS–RESPONDENTS, v. ERIC BEN-
TOLILA, M.D., AND GITA PATEL, R.N., DEFENDANTS, AND
THE VALLEY HOSPITAL, KOURTNEY KACZMARSKI, R.N.,
MARY BROWN, R.T., AND YIE–HSIEN CHU, M.D., DEFEN-
DANTS–RESPONDENTS/CROSS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued April 30, 2012—Decided August 9, 2012.

120

Before Judges SABATINO, ASHRAFI, and FASCIALE.

*Cynthia A. Walters* argued the cause for appellants/cross-respondents (*Budd Larner, P.C.*, attorneys; *Ms. Walters*, of counsel and on the brief).

*Rowena M. Duran* argued the cause for respondents/cross-appellants (*Buckley Theroux Kline & Petraske, LLC*, attorneys for The Valley Hospital, Mary Brown, R.T., and Yie–Hsien Chu,

M.D.; *Vasios, Kelly & Strollo, P.A.*, attorneys for Kourtney Kaczmarski ; *Ms. Duran* and *Karla M. Donovan*, of counsel; *Ms. Duran, Ms. Donovan*, and *Linda Fulop–Slaughter*, on the joint briefs).

*Susan J. Dougherty*, Deputy Attorney General, argued the cause for respondent State of New Jersey (*Jeffrey S. Chiesa*, Attorney General, attorney; *Melissa H. Raksa*, Assistant Attorney General, of counsel; *Ms. Dougherty*, on the brief).

*E. Drew Britcher* argued the cause for amicus curiae New Jersey Association for Justice (*Britcher, Leone & Roth*, attorneys; *Mr. Britcher*, of counsel and on the brief; *Kristen B. Miller*, on the brief).

*Ross A. Lewin* argued the cause for amicus curiae New Jersey Hospital Association (*Drinker Biddle & Reath LLP*, attorneys; *Mr. Lewin*, of counsel and on the brief).

The opinion of the court was delivered by

SABATINO, J.A.D.

In this case of first impression, we ascertain the dimensions of the confidentiality provisions contained within the Patient Safety Act (the "PSA" or the "Act"), *N.J.S.A.* 26:2H–12.23 to –12.25. We also examine their interplay with other laws and procedures, including the qualified common-law privilege for self-critical analysis of medical peer review documents, as set forth in *Christy v. Salem*, 366 *N.J.Super.* 535, 841 *A.*2d 937 (App.Div.2004).

The Legislature adopted the PSA in 2004 in an effort to promote within health care facilities the candid exploration of what may have caused, or nearly caused, an adverse event to a patient, in order to better understand how such risks may be prevented in the future. We consider that policy objective in the context of this medical malpractice case, in which it is alleged that an infant was negligently deprived of oxygen at birth, resulting in her brain damage. Plaintiffs have sought to obtain certain documents that were internally generated within the hospital after an investiga-

tion of the care provided to the newborn and her mother. Defendants contend that those documents are privileged from disclosure under the PSA.

For the reasons that follow, we hold that post-event investigatory and analytic documents exclusively created in compliance with the PSA and its associated regulations, and not created for some other statutory or licensure purpose, are absolutely privileged from disclosure under the PSA. The PSA's confidentiality provisions insulate such documents from outside access. They do so regardless of a plaintiff's asserted need for disclosure and regardless of whether the documents contain factual information in addition to subjective opinions. However, if the specified procedures of the PSA and the related regulations have not been observed, or if the documents have been generated for additional non-PSA purposes, then the PSA's absolute privilege does not apply. Instead, other legal principles govern, such as those expressed in *Christy*, depending upon the kind of document involved.

Applying these principles, we affirm in part the trial court's application of the PSA to the contested documents, and reverse it in part.

I.

Before delving into the facts and procedural history of this litigation, we first provide, by way of context, an introductory overview of the PSA and of our decision in *Christy*, both of which were key aspects of the trial court proceedings.

A.

The PSA was signed into law on April 27, 2004 and took effect six months later. *L.* 2004, *c.* 9, § 4. In enacting the PSA, the Legislature observed in its codified findings that "the health care literature demonstrates that the great majority of medical errors result from systems problems, not individual incompetence[.]"

*N.J.S.A.* 26:2H–12.24(a). The Legislature further recognized that "[w]ell-designed systems" within health care facilities "have processes built in to minimize the occurrence of errors, as well as to detect those that do occur[.]" *N.J.S.A.* 26:2H–12.24(b). Such optimal systems "incorporate mechanisms to continually improve their performance[.]" *Ibid.* Hence, "[t]o enhance patient safety, the [legislative] goal is to craft a health care delivery system that minimizes, to the greatest extent feasible, the harm to patients that results from the delivery system itself[.]" *N.J.S.A.* 26:2H–12.24(c). More specifically, "[a]n important component of a successful patient safety strategy is a feedback mechanism that allows detection and analysis not only of adverse events, but also of 'near-misses[.]'" *N.J.S.A.* 26:2H–12.24(d).

The Legislature was manifestly concerned that such after-the-fact detection and analysis were not occurring within New Jersey health care facilities to an extent desired to promote future patient safety. In that vein, the PSA appears to have been sparked, at least in part, by a series of notorious patient homicides committed by a nurse at various New Jersey hospitals. *Hearing on S. 557 Before the S. Comm. on Health, Human Services and Senior Citizens,* 211th Leg. 1–2 (Jan. 26, 2004) (statement of Joseph F. Vitale, Comm. Chair). The Legislature was concerned that professionals and staff within health care facilities can feel inhibited in reporting or criticizing unsafe practices within the institution. Such inhibition may stem from fear of repercussions, inertia, and other factors that can lead to under-reporting and the institution's failure to take prospective corrective measures.

Based upon these concerns, the Legislature resolved in the PSA to promote disclosure and reporting:

> To encourage disclosure of these [adverse or near-miss] events so that they can be analyzed and used for improvement, it is critical to create a non-punitive culture that focuses on improving processes rather than assigning blame. Health care facilities and professionals must be held accountable for serious preventable adverse events; however, punitive environments are not particularly effective in promoting accountability and increasing patient safety, and may be a deterrent to the exchange of information required to reduce the opportunity for errors to occur in the complex systems of care delivery. Fear of sanctions induces health care

professionals and organizations to be silent about adverse events, resulting in serious under-reporting[.]

[*N.J.S.A.* 26:2H–12.24(e).]

The Legislature sought to address these described problems

[b]y establishing an environment that both mandates the *confidential* disclosure of the most serious, preventable adverse events, and also encourages the voluntary, anonymous and *confidential* disclosure of less serious adverse events, as well as preventable events and near misses[.]

[*N.J.S.A.* 26:2H–12.24(f) (emphasis added).]

By establishing such confidential processes,

the State seeks to increase the amount of information on systems failures, analyze the sources of these failures and disseminate information on effective practices for reducing systems failures and improving the safety of patients.

[*Ibid.*]

There are two vital parts to the PSA reporting system: (1) the framework within the medical facility for implementing it, and (2) the confidential treatment of communications made pursuant to the PSA, in order to encourage reporting and self-critical analysis. We first describe the framework components.

In its definitional section, the PSA distinguishes between several terms describing the nature and relative severity of various patient events. Specifically, an "adverse event" under the Act "means an event that is a negative consequence of care that [actually] results in unintended injury or illness, which may or may not have been preventable." *N.J.S.A.* 26:2H–12.25(a). By contrast, a "near-miss" refers to "an occurrence that could have resulted in an adverse event but [where] the adverse event was prevented." *Ibid.* A "preventable event," meanwhile, is defined as "an event that could have been anticipated and prepared against, but occurs because of an error or other system failure." *Ibid.* Finally, a "serious preventable adverse event"—the most extreme category—consists of "an adverse event that is a preventable event and results in death or loss of a body part, or disability or loss of bodily function lasting more than seven days or still present at the time of discharge from a health care facility." *Ibid.*

Subsection (c) of *N.J.S.A.* 26:2H–12.25 mandates the reporting to the State of all "serious preventable adverse events" within a

facility. It states that "[a] health care facility *shall report* to the [D]epartment [of Health [1]] or, in the case of a State psychiatric hospital, to the Department of Human Services, in a form and manner established by the commissioner, *every serious preventable adverse event* that occurs in that facility." *N.J.S.A.* 26:2H–12.25(c) (emphasis added).

In addition, the PSA calls for certain measures to encourage the disclosure and analysis of non-serious or non-preventable adverse events, as well as near-misses. The statutory framework requires each health care facility to "develop and implement a patient safety plan for the purpose of improving the health and safety of patients at the facility." *N.J.S.A.* 26:2H–12.25(b). The prescribed patient safety plan must, at a minimum, include:

(1) a *patient safety committee,* as prescribed by regulation;

(2) a process for *teams of facility staff,* which teams are comprised of personnel who are representative of the facility's various disciplines and have appropriate competencies, to conduct ongoing analysis and application of evidence-based patient safety practices in order to reduce the probability of adverse events resulting from exposure to the health care system across a range of diseases and procedures;

(3) a process for *teams of facility staff,* which teams are comprised of personnel who are representative of the facility's various disciplines and have appropriate competencies, to conduct analyses of near-misses, with particular attention to serious preventable adverse events and adverse events; and

(4) a process for the provision of *ongoing patient safety training* for facility personnel.

[*Ibid.* (emphasis added).]

The statute clarifies that these required elements of a patient safety plan do not "eliminate or lessen a hospital's obligation under current law or regulation to have a continuous quality improvement program." [2] *Ibid.*

---

[1] The Legislature recently changed the name of the former Department of Health and Senior Services ("DHSS") to the Department of Health ("DOH"). *L.* 2012, *c.* 17 (approved June 29, 2012).

[2] We discuss in Part II, *infra,* the features of "continuous quality improvement programs," which are independent of the PSA.

The PSA further provides that patients or their family members affected by either a serious preventable adverse event, or an adverse event relating to an allergic reaction, must be informed about such matters in a timely fashion, unless such disclosure would be detrimental to the patient's health. *N.J.S.A.* 26:2H–12.25(d). In addition, the Act encourages health care professionals and other employees to make anonymous reports to the State of near-misses, preventable events, and adverse events that are not subject to the Act's mandatory reporting requirements. *N.J.S.A.* 26:2H–12.25(e). The statute has several other structural facets that need not be discussed here.

Within this described framework, the PSA also contains several important confidentiality provisions. Those provisions are designed to achieve the statute's objective to establish "an environment that both mandates the *confidential* disclosure of the most serious, preventable adverse events, and ... encourages the voluntary, anonymous and *confidential* disclosure of less serious adverse events, as well as preventable events and near-misses[.]" *N.J.S.A.* 26:2H–12.24(f) (emphasis added).

Subject to certain exceptions for access by the Attorney General and the pertinent regulatory agencies, or for use as evidence in certain disciplinary actions, the PSA provides:

> f. *Any documents, materials, or information received by the [D]epartment [of Health] or the Department of Human Services,* as applicable, pursuant to the provisions of subsections c. and e. of this section concerning serious preventable adverse events, near-misses, preventable events, and adverse events that are otherwise not subject to mandatory reporting pursuant to subsection c. of this section, *shall not be:*
>
> (1) *subject to discovery or admissible as evidence or otherwise disclosed in any civil, criminal, or administrative action or proceeding;*
>
> (2) *considered a public record* under *P.L.* 1963, c. 73 (C.47:1A–1 et seq.) or *P.L.* 2001, c. 404 (C.47:1A–5 et al.); or
>
> (3) used in an *adverse employment action* or in the evaluation of decisions made in relation to *accreditation, certification, credentialing, or licensing of an individual,* which is based on the individual's participation in the development, collection, reporting or storage of information in accordance with this section.
>
> [*N.J.S.A.* 26:2H–12.25(f) (emphasis added).]

Likewise, subsection (g) of *N.J.S.A.* 26:2H–12.25 extends similar confidentiality protection to documents, materials, or information that have not been reported to State regulators, if such items have nevertheless been "developed" by the health care facility "as part of a process of self-critical analysis conducted pursuant to [a patient safety plan in accordance with *N.J.S.A.* 26:2H–12.25(b).]" In particular, except for certain disciplinary matters described in subsection (g)(2), *N.J.S.A.* 26:2H–12.25(g) prescribes:

> *Any documents, materials, or information developed by a health care facility as part of a process of self-critical analysis conducted pursuant to subsection b.* of this section concerning preventable events, near-misses, and adverse events, including serious preventable adverse events, and any document or oral statement that constitutes the disclosure provided to a patient or the patient's family member or guardian pursuant to subsection d. of this section, *shall not be:*
>
> (1) *subject to discovery or admissible as evidence or otherwise disclosed in any civil, criminal, or administrative action or proceeding;* or
>
> (2) used in an *adverse employment action* or in the evaluation of decisions made in relation to *accreditation, certification, credentialing, or licensing of an individual,* which is based on the individual's participation in the development, collection, reporting, or storage of information in accordance with subsection b. of this section.
>
> [Emphasis added.]

Thus, the PSA's umbrella of confidentiality extends beyond the mandatory reports that health care facilities must make to the State for "serious preventable adverse events." The statute also is designed to foster internal self-critical analysis on certain matters that do not rise to the severity of a "serious preventable adverse event."

After reciting these confidentiality protections in subsections (f) and (g) of *N.J.S.A.* 26:2H–12.25, the PSA thereafter references, in subsection (k), this court's published opinion in *Christy.* That opinion had been coincidentally issued in February 2004, two months before the PSA was signed into law. Subsection (k) declares:

> k. Nothing in this act shall be construed to increase or decrease the discoverability, in accordance with *Christy v. Salem,* [366 *N.J.Super.* 535, 841 *A.*2d 937 (App.Div.2004),] of any documents, materials or information if obtained from any source or context other than those specified in this act.
>
> [*N.J.S.A.* 26:2H–12.25(k).]

The intended meaning of subsection (k), and its impact upon the confidentiality provisions within the PSA, are at the crux of the parties' legal disagreement in the present appeal and cross-appeal.[3]

### B.

In *Christy,* a medical negligence case, the plaintiff sought discovery of a report issued by the defendant hospital's "peer review committee" that had investigated the plaintiff's care and treatment. *Christy, supra,* 366 *N.J.Super.* at 538, 841 *A.*2d 937. On appeal from the trial court's order to disclose the committee's report to the plaintiff, we balanced the opposing interests involved, drawing a distinction between the factual and evaluative portions of the report. *Id.* at 543–44, 841 *A.*2d 937.

█ Applying common-law principles, we held in *Christy* that the plaintiffs were entitled to disclosure of "purely factual material," because they have "a right to discover the location of critical information, which would logically be expected to be in the possession of an adversary but is missing for some unexplained reason." *Id.* at 541, 543–44, 841 *A.*2d 937. A hospital, by contrast, should be presumptively entitled to preserve the confidentiality of its "opinions, analysis and findings of fact[.]" *Id.* at 544, 841 *A.*2d 937. However, a plaintiff may obtain discovery of evaluative material upon a showing of a "compelling need." *Ibid.* Thus, the extent that peer review reports are discoverable under the criteria of *Christy* depends upon: (1) whether the contents of the reports are factual in nature, and (2) whether a plaintiff can show a compelling need to obtain discovery of the evaluative, non-factual portions within those reports. *Id.* at 543–44, 841 *A.*2d 937.

### II.

We now detail the chronology of events that led to the present appeal. Because this matter is before us on interlocutory review

---

[3] We resolve that disagreement in Part III of this opinion, *infra.*

of the trial court's disposition of a discovery motion, the actual facts underlying plaintiffs' medical malpractice claim have not been conclusively determined. We thus summarize the relevant allegations from plaintiffs' submissions and their expert's opinions as described in their brief, with the caveat that these allegations have not yet been proven in the underlying action.

On May 26, 2007, plaintiff Esther Applegrad was admitted to the maternity ward at defendant The Valley Hospital ("the Hospital"). She gave birth to C.A. that same day.

Plaintiffs contend that prior to C.A.'s delivery, a nurse employed at the Hospital, defendant Kourtney Kaczmarski, R.N., failed to timely discover or alert the attending obstetrician, defendant Eric Bentolila, M.D., that C.A. was in a breech position. Dr. Bentolila elected not to deliver C.A. through a Caesarean section, but to deliver her vaginally, a decision which allegedly resulted in birth complications for C.A. The record contains allegations that, after the birth, he attempted to destroy a medical document in connection with C.A.'s delivery.[4]

After Dr. Bentolila delivered C.A., a pediatrician, defendant Yie–Hsien Chu, M.D., assumed her care. Plaintiffs claim that Dr. Chu negligently resuscitated C.A., and did not timely notify the anesthesiologist of C.A.'s malfunctioning intubation tube, resulting in C.A. suffering anoxic brain injury.

Based upon the expert opinion of a pediatric neurologist, plaintiffs assert that non-negligent care by defendants would have either prevented or limited the scope of C.A.'s injury. Conversely, defendants maintain that C.A.'s hospital records establish that the infant was resuscitated in the immediate post-birth period, and that her brain injury had proximately resulted from unpreventable

---

[4] Since Dr. Bentolila is no longer a party to this case and the issues respecting his own conduct have not been adjudicated, we make no findings as to whether he attempted to destroy a medical record or otherwise acted in an improper fashion.

birth complications, unrelated to the care provided to her and her mother at the Hospital.

Plaintiffs brought an action in the Law Division, alleging negligence in the delivery and subsequent care of C.A., against the Hospital, Dr. Bentolila, Gita Patel, R.N., Nurse Kaczmarski, Mary Brown, R.T., and Dr. Chu. Dr. Bentolila and Nurse Patel were dismissed as party defendants in 2009.

During discovery, plaintiffs moved to compel the disclosure of the Hospital's investigative and peer review records relating to C.A.'s birth. The Hospital initially withheld six of those documents from disclosure, invoking the self-critical analysis privilege for "evaluative and deliberative" material under *Christy, supra,* 366 *N.J.Super.* at 543, 841 *A.*2d 937. The Hospital identified those six records with the following headings, which the trial court marked as exhibits DV1 to DV6 [5]:

| Exhibit | The Hospital's Identification of the Document | Dated |
| --- | --- | --- |
| DV1 | Occurrence Report | 5/26/07 |
| DV2 | Director of Patient Safety Post–Incident Analysis | 6/1/07 |
| DV3 | Department of Risk Management Request for Quality Assurance Review | 6/29/07 |
| DV4 | Mother/Baby Quality Assurance Performance Review | 7/9/07 |
| DV5 | Department of OB/GYN Quality Assurance Response | 7/20/07 |
| DV6 | Utilization Review Committee, Quality Assessment and Improvement Subcommittee Department of OB/GYN | 9/10/07 |

After initially reviewing these six records *in camera,* the motion judge, applying the fact/opinion criteria of *Christy,* proposed to the Hospital a disposition of the privilege issues. The Hospital

---

[5] DV1 through DV6 are the core documents in dispute. During the remand proceedings, the trial court marked as DV7 through DV13 several related documents for identification, but only DV12 and DV13 of that latter group are at issue on this appeal.

objected to that proposed disposition. In an ex parte brief filed with the judge, the Hospital invoked the PSA for the first time, arguing that the PSA fully protected these records from disclosure as an absolute privilege.

Following an ex parte hearing in which he evaluated defendants' revised privilege contentions, the judge reconsidered his assessment and found that the records were all protected from discovery under the PSA. The court thus entered orders on September 15, 2009 and November 18, 2009 denying plaintiffs' motion to compel their disclosure.

In April 2010, we granted plaintiffs' initial motion for leave to appeal the trial court's orders. In an ensuing unpublished opinion, this court vacated its order granting plaintiffs leave to appeal, and remanded the case to the trial court for further development of the record. *C.A. v. Bentolila,* No. A–3747–09 (App.Div. Jan. 5, 2011) (slip op. at 29–31).

In our initial opinion, we noted the murky state of the record "concerning the origins and purposes of the allegedly-privileged documents" that bears upon whether they were each developed in accordance with the PSA, and thus protected from disclosure under *N.J.S.A.* 26:2H–12.25(g). *Id.* at 24. We also noted several potentially applicable legal issues that the parties had not sufficiently developed before the trial court. *Id.* at 23. Accordingly, we remanded the matter so that these outstanding legal and factual issues could be addressed. *Id.* at 29–31.

On remand, the trial court heard testimony over seven days from persons at the Hospital who were involved in the development of the allegedly privileged records. Defendants, on reflection, modified their earlier position that all of the withheld documents were privileged under the PSA, and instead limited their claims of PSA confidentiality to exhibits DV2 and DV5. Defendants asserted confidentiality on other grounds as to the remaining documents. Plaintiffs opposed those contentions. They also asserted that the confidentiality provisions in the PSA are an

unconstitutional violation of principles of separation of powers because the Judiciary was not involved in their adoption.

After considering the remand testimony and further arguments of counsel, the trial judge issued an oral decision on September 12, 2011. This time, the judge specifically concluded: (1) DV2 was exempt from disclosure under the PSA, except for the names of the persons who participated in developing it; and (2) the remaining documents were governed by the standards of *Christy*, which the judge then applied to those items, except for DV6, which he found to be privileged under a separate provision, *N.J.S.A.* 2A:84A–22.8. The trial judge declined to declare the PSA's confidentiality provisions unconstitutional. The judge entered an order on September 26, 2011 reflecting these determinations.

The extensive record developed in the trial court on remand focused upon the Hospital's internal review of the circumstances of C.A.'s birth and the care that she and her mother had received. As the Hospital now concedes, the record shows that some of those internal review activities, and the related communications, were clearly outside the processes authorized or mandated by the PSA. In particular, some of the activities and communications were part of the Hospital's "continuous quality improvement" program and also its "utilization review" processes.

Hospitals in our State are required to maintain a continuous quality improvement program. *See N.J.A.C.* 8:43G–27.1 to –27.6. Those programs must also include a utilization review process, as required by federal law. *See Todd v. S. Jersey Hosp. Sys.*, 152 *F.R.D.* 676, 682 (D.N.J.1993) (noting that utilization review is a requirement of a hospital's participation under the Social Security Act, and in federal and state funded programs).

A hospital may also implement a process for "self-critical analysis" in accordance with guidelines promulgated by the Joint Commission, a national accreditation body.[6] The Joint Commission

---

[6] Formerly called the Joint Commission on Accreditation of Healthcare Organizations. *See Reyes v. Meadowlands Hosp. Med. Ctr.*, 355 *N.J.Super.* 226, 229, 809 *A.2d* 875 (Law Div.2001).

encourages hospitals to voluntarily conduct so-called "root cause analysis" of certain medical errors, known as "sentinel events," and to report the results of such analyses to the Joint Commission. *See Reyes, supra,* 355 *N.J.Super.* at 229, 809 *A.*2d 875.

The Hospital has implemented such a continuous quality improvement program known as its "Performance Improvement Plan." The Plan includes a peer review and utilization review process, as well as a process for reporting root cause analyses of sentinel events to the Joint Commission. As Kim Robles, the Hospital's Director of Quality Assessment Improvement and Regulatory Compliance, explained it:

> Peer review is the process by which ... a case is reviewed by a colleague of a physician to determine whether the standard of care, based on evidence[-]based medicine is met. If it is not met then that is when I said to you before, that it would go to either a subcommittee, a department director for further determination.

> But it is really the review from one colleague to another. And we make sure that there is not any competition within that[.]

> . . . .

> It ... is shared with [the Hospital's unit for professional] credentialing, because that's how peer review is part of the reappointment process, which is done every two years for the physicians. And it also is part of their ongoing performance improvement.

Robles also explained the Hospital's separate "utilization review" process:

> Utilization review can focus on quality issues. That can be an outcome of their review. But utilization review primarily ... focuses on a physician's practice of his admission [of a patient], the appropriateness of the admission, his length of stay, the resources that he's using within that patient's stay within the hospital.

> It looks at whether the insurance or Medicare or Medicaid would deny the admission or deny days within the hospitalization itself. So its focus is a little bit more financial in its goal.

A utilization review process is subject to a statutory privilege against disclosure. *N.J.S.A.* 2A:84A–22.8. Our State does not have a similar statutory privilege covering the peer review process. However, decisional law has developed a common-law qualified privilege for such peer review reports. *See Christy, supra,* 366 *N.J.Super.* at 543–44, 841 *A.*2d 937.

Against this backdrop of existing programs, the Hospital established a patient safety program after the 2004 passage of the PSA. The Hospital created a Patient Safety Committee, headed by the facility's chief medical officer, a physician. According to the Hospital, the sixteen-member Patient Safety Committee is an independent "decision-making committee that provides summary report[s] to the Board of Trustees." The Hospital also established a new position of Director of Patient Safety, held by Michael Mutter, who also sits on the Patient Safety Committee. As Director, Mutter is tasked with undertaking factual investigations of patient safety events under the Act. Notably, Mutter is also responsible for investigations under the continuous quality improvement program. Mutter's testimony suggests that these investigations are similar, and can overlap.

Prior to the PSA, the Hospital's Risk Management Department had conducted internal investigations of certain patient mishaps in the context of the continuous quality improvement program. As we will discuss in more detail, the Risk Management Department now retains a role in these investigations. Linda Malkin is the Hospital's Director of Risk Management.

Robles, Mutter, and Malkin are not physicians. Robles is a nurse by training, Mutter is a pharmacist, and Malkin is a professional risk manager with a nursing degree and nursing license. Their responsibilities do not appear to involve providing any direct patient care, nor directly supervising the professionals and staff who provide such care at the Hospital.

During the remand proceedings, the trial court heard lengthy testimony from Robles and Mutter, and, to a lesser extent, Malkin, about the Hospital's post-event review of the circumstances of C.A.'s birth. They also collectively described the genesis of each of the withheld documents. Although defendants presently confine their argument to a claim that only DV2 and DV5 are privileged under the PSA, we briefly describe each of the withheld documents for purposes of comparison and context.

*DV1: The Occurrence Report*

The complications C.A. suffered after birth registered an Apgar score[7] value that internally triggered an "Occurrence Report," authored by Nurse Patel, the clinical shift supervisor at the time of C.A.'s birth. The purpose of this report, DV1, was to record an event that qualified for further investigation. According to the Hospital's counsel, the Apgar Score was apparently the qualified event that prompted DV1. After DV1 was prepared, it was sent to the Risk Management Department for review.

*DV3: Risk Management's Request for Quality Assurance Review*

After receiving DV1, the Risk Management Department requested a peer review assessment from the Quality Assurance Coordinator. That request, DV3, summarized the facts, and posed questions for the peer reviewer about C.A.'s quality of care. According to Robles' testimony, the Hospital's coordinator of Quality Assurance would, based upon DV3, "prepare a referral to the peer reviewer" with "the same credentialing that the questions would relate to[.]"

*DV4, DV12, and DV13: Mother/Baby Peer Review*

Two peer reviewers analyzed the events relating to C.A.'s birth. A staff physician report and worksheet was prepared by Benjamin R. Dispenziere, M.D., an obstetrician. In addition, a similar worksheet was prepared by a pediatrician, Dr. Jedlinski.[8] The trial court marked Dr. Dispenziere's report as DV4, his worksheet as DV12, and the Jedlinski worksheet as DV13. No other peer reviewers were apparently consulted. Robles explained that the

---

[7] An Apgar score is defined as "an index used to evaluate the condition of a newborn infant based on a rating of 0, 1, or 2 for each of the five characteristics of color, heart rate, response to stimulation of the sole of the foot, muscle tone, and respiration with 10 being a perfect score[.]" *Merriam–Webster's Medical Desk Dictionary* 49 (1996).

[8] The record does not indicate Dr. Jedlinski's first name.

Hospital had such a peer review process in place before the enactment of the PSA. She also noted that the peer reviewers only review the patient's medical chart.

*DV6: Utilization Review Committee Meeting Minutes*

Dr. Dispenziere's and Dr. Jedlinski's peer review records were sent to the Utilization Review Committee, specifically to the Quality Assessment and Improvement Subcommittee, which reviews matters of quality control in the Hospital's Department of OB/GYN. The Quality Assessment and Improvement Subcommittee discussed C.A.'s birth and reviewed the peer review records at a meeting. That meeting's minutes confirm that such a discussion of C.A.'s birth occurred.[9]

*DV2: The Director of Patient Safety's Post–Incident Analysis*

Mutter conducted a "Post–Incident Analysis" of C.A.'s birth at Malkin's request. To do so, Mutter conducted what he described as a "round-table" discussion with certain Hospital staff who had knowledge of the circumstances of C.A.'s birth. Mutter then memorialized the round-table discussion in a memorandum, DV2, which he addressed to Malkin.

Mutter testified that he would conduct a post-incident analysis by facilitating a group discussion with the "caregivers that were involved in the case that we can identify, as well as some other individuals[,]" such as "local leadership." He would typically begin this discussion by asking the group to identify "a starting point[,]" usually when the patient was admitted to the Hospital, followed by a "course of events" that unfolded "minute by minute, hour by hour, [or] shift by shift." Through this process, Mutter would learn about the facts of the case and attempt to identify process failures. Mutter would also encourage the group to express "emotions" about the case. Thus, according to Mutter,

---

[9] The trial court held that the minutes of this meeting, DV6, were protected from disclosure pursuant to the privilege for utilization review reports in *N.J.S.A.* 2A:84A–22.8. Plaintiffs have not appealed this discrete finding, although they contend that an exception to that non-PSA privilege potentially applies.

the round-table discussion facilitated three goals: (1) learning the "[f]acts of the case[;]" (2) "understanding process [ ], how can we mitigate [process failures] from happening again[;]" and (3) "building out [sic] esteem so we can [continue] ... caring for patients."

Mutter further explained that when he conducted this type of a discussion, he was conducting a root cause analysis of the event "as a process." He would direct the discussion by asking questions from the "form that the State prescribes under the [Act]" for conducting a root cause analysis.[10] However, Mutter only filled out the form if he identified a reportable event, in which case the form would be submitted to the State regulatory agency (then the DHSS, now the DOH) when the event was reported.

According to Mutter, he took contemporaneous notes when he held the round-table discussion of the circumstances surrounding C.A.'s birth. No physicians participated in the round-table discussion. Some of those who participated in the discussion did not render treatment to C.A. The discussion encompassed the circumstances of C.A.'s treatment and Dr. Bentolila's alleged attempt to destroy documentation relating to the treatment provided during C.A.'s birth.

Mutter then typed up his notes in a three-page memorandum, before destroying the notes.[11] The date of the round-table discussion is not in the record, but the memorandum is dated June 1, 2007, six days after C.A.'s birth. Mutter addressed and sent the memorandum to Malkin only, maintaining a copy in his file.

*DV5: Department of OB/GYN Quality Assurance Response*

Malkin testified that she first learned about this case when an unidentified person from the Nursing Department told her that

---

[10] Mutter appears, in this regard, to be referring to the State's model root cause analysis form, as provided at *N.J.A.C.* 8:43E–10, Appendix B.

[11] The trial judge observed that this memorandum contained a notation declaring that it was "created" and "protected" under the PSA. As we note, *infra*, the manner in which such documents are labeled is not legally controlling.

Dr. Bentolila had attempted to destroy a one-page document in the mother's hospital record. The document was thereafter returned to the hospital record.

Although Malkin received the Occurrence Report, which she asserted is used by Risk Management to generate "de-identified summary data for Continuous Quality Improvement," it was Dr. Bentolila's alleged attempt to destroy a record that prompted her to investigate C.A.'s birth. She sent the case "for peer review," and to Mutter, asking him to conduct a "patient safety investigation to determine if there were any process failures." Malkin did not attend Mutter's round-table discussion.

Malkin received Mutter's memorandum, DV2, at the conclusion of Mutter's investigation. She discussed it with Mutter "just to confirm his findings" and determine the type of event under the Act and whether to report it to the DHSS. Mutter's memorandum, DV2, was filed with the Occurrence Report, DV1, in the Risk Management Department.

Six weeks later, Malkin convened a meeting, "in follow-up" to Mutter's round-table discussion, to examine whether any process enhancements implicated by C.A.'s circumstances should be addressed by the Hospital. Malkin met at that time with "local leadership for [the] Mother Baby [program] and educators" to discuss the suitability of such process enhancements. She prepared a July 20, 2007 memorandum addressed to staff who attended the meeting "to memorialize what we talked about" and the "issues we discussed." According to Malkin, her memorandum, DV5, discusses "processes," and not treatment. To prepare it, Malkin would have necessarily reviewed DV1, DV2, and DV3.

*The Decision Not to Report the Event to the Patient Safety Committee*

Following Mutter's investigation, Robles, Mutter and Malkin determined that C.A.'s injury did not qualify as an event that must be reported to the State under the PSA. Consequently, the matter was not referred to the Patient Safety Committee for review. Their decision to refrain from referring the matter to the Commit-

tee is not memorialized in a contemporaneous document, but all three participants agreed in their testimony that they made that decision after discussing it. Robles noted that their discussion was not a formal meeting, but was a "review of our investigations," which occurred in the office suite that the three of them shared. She explained that if an event was clearly not reportable under the PSA, then she, Mutter and Malkin would ordinarily make the final decision, but if they disagreed, then the trio would convene a meeting.

Robles's testimony suggests that, after considering the peer review data, but not apparently the written peer review reports, she regarded C.A.'s injury as an adverse event. However, Robles concluded that the event was "not preventable" because, in her view, there was no human error involved. She therefore did not believe that C.A.'s injury was an event that was required to be reported to the DHSS under the PSA, and for this reason, it was not referred internally to the Patient Safety Committee for further review.

Mutter testified that he determined that the events concerning C.A.'s delivery did not need to be reported to the State, based on his conversations at the round-table discussion with staff members. Mutter believed that the event was not an adverse event under the PSA, and therefore did not need to be reported, regardless of whether it was preventable.

According to Mutter, the Patient Safety Committee later received "aggregate information" on C.A.'s case after the trio's decision not to report the case as a discrete matter to the Committee was made. However, the Committee did not receive specific information about C.A.'s case. Mutter explained that this screening process was established "by the genesis of the [Patient Safety] [C]ommittee, of what the [C]ommittee ... wanted for what will be specific cases and what would be aggregate cases."

Malkin likewise testified that she did not believe C.A.'s injury was reportable to the State under the PSA. She explained that, in her view, the injury "was not a negative outcome from care and

treatment. It didn't come out of care or treatment that was faulty."

### The Trial Court's Remand Decision

In its September 12, 2011 decision, the trial court examined these issues in detail. First, the court distinguished between documents created under the PSA, which it deemed to be absolutely privileged under the statute, and those created "outside" the PSA, which the court held to be controlled by the factual/evaluative distinction in *Christy:*

> I find from reading the Patient Safety Act that it is a full privilege, meaning that once it's been decided that a document has been created pursuant to the Patient Safety Act it does not receive a *Christy*-type analysis. In other words, if a document is created pursuant to the Patient Safety Act and embodies the result of an investigation, pursuant to the Act, it is entitled to a full privilege and would not be subject to a *Christy* analysis.
>
> I find that the [L]egislature included the language in the statute about neither increasing nor decreasing the holding in *Christy* to apply to other documents that may be intertwined and related, such as Peer Review documents, certain Quality Assurance documents, and documents that are created outside of the Patient Safety Act, which really is what happened in this case.

Applying this interpretation of the PSA, the trial court found that Mutter's memorandum, DV2, was the only document that was potentially created under the Act and subject to an absolute privilege. The court did recognize that DV2 was not created strictly in accordance with the PSA. Nevertheless, the court held that the Hospital's "substantial compliance" with the PSA was sufficient to satisfy the statute.

The court further concluded that the date of Mutter's round-table discussion and the attendees at that discussion should, in fairness, be released to plaintiffs, so as to permit them to depose the attendees.[12] The court analogously relied in this regard on cases construing the attorney-client privilege as not protecting the addresses of clients.[13] The court further concluded that the judge

---

[12] The Hospital has not appealed this discrete ruling.

[13] *See, e.g., Fellerman v. Bradley,* 99 *N.J.* 493, 493 A.2d 1239 (1985); *Horon Holding Corp. v. McKenzie,* 341 *N.J.Super.* 117, 775 A.2d 111 (App.Div.2001).

who ultimately presides [14] over the trial should be given a copy of DV2 to decide, in his or her discretion, whether to refer to it during trial in making determinations about the testimony of witnesses.

The trial court ruled that DV1, DV3, DV4, DV5, DV12, and DV13 were all subject to a balancing assessment under *Christy*. Because the Hospital did not suggest redactions to DV1, the court found that DV1 must be released to plaintiffs without redactions. As for DV3, DV4, DV12, and DV13, the court redacted the information that it determined to be evaluative and not factual, and authorized release of the remaining contents. In considering DV5, the court found that, although it was not a record created under the PSA, it should be fully redacted under *Christy* because it contained no factual statements. Lastly, as for DV6, the utilization review committee meeting minutes, the court held that it was fully privileged under *N.J.S.A.* 2A:84A-22.8.

As an alternative basis for relief, plaintiffs argued to the trial court that the PSA's privilege provisions are unconstitutional because they violate separation of powers. In particular, plaintiffs argued that the Legislature could not adopt evidence rules without the Judiciary's involvement, and that the Legislature did not follow the process specified for adopting evidence rules under the Evidence Act of 1960, *N.J.S.A.* 2A:84A-33 to -44. The court rejected this argument, relying on *State v. Byrd*, 198 *N.J.* 319, 967 *A.*2d 285 (2009), and finding that the "[L]egislature showed respect to the Supreme Court by acknowledging . . . *Christy*[.]" The court further noted that if the Supreme Court determined that the PSA was in conflict with its constitutional authority, it could address that problem by a rule or an opinion.

On September 14, 2011, the trial court held an additional hearing to clarify and supplement its oral decision. During the course of that hearing, the court observed that there was not "a

[14] The judge who issued the September 2011 remand decision is not currently presiding over civil trials.

tremendous difference in the way [the Hospital] investigated incidents before and after the Patient Safety Act." The differences were "slight" and insignificant "as far as ... [the court was] concerned." Nevertheless, the court reiterated that the Hospital deserves protection under the PSA as to DV2 because it had substantially complied with the PSA.

The court reiterated that the Act applied to DV2 because: (1) DV2 contained Mutter's notation of having been prepared in accordance with the PSA; (2) DV2 was created by Mutter, the Director of Patient Safety; (3) those who had participated in Mutter's round-table discussion were "purely medical providers"; (4) no representatives from Risk Management were present during Mutter's discussion; and (5) following the round-table, Mutter discussed with his colleagues whether the case should be reported under the PSA.

Significantly, the trial court noted in its rulings that the events concerning C.A.'s birth should have been submitted to the Patient Safety Committee and also should have been reported thereafter to the State. In addition, the court took issue with the fact that Malkin, as Director of Risk Management, had participated in the decision not to report the incident. However, these particular observations did not affect the trial court's conclusion to enforce the PSA's confidentiality provisions as to DV2. The court found that, despite the reporting failures, the Hospital officials had acted in good faith concerning DV2.

By contrast, the trial court noted that DV5 was not protected by the Act because: (1) it was a Risk Management document, not a patient safety document; and (2) it did not affect the decision not to report the event to the State. However, because "there are no facts in the document," the court held that DV5 would be fully protected from disclosure under *Christy*.[15]

---

[15] That same day, the trial court held a discussion in a sealed proceeding with the two defense attorneys about the redactions that it made to the documents. The court redacted an additional passage from DV3, after accepting the repre-

The trial court's post-remand rulings were embodied in an order dated September 26, 2011. Plaintiffs appeal from that order, insofar as the trial court concluded that DV2 is privileged in its entirety under the PSA. Plaintiffs contend that disclosure of DV2 instead should be governed by the criteria of *Christy*. They also renew their challenge to the constitutionality of the PSA. Defendants, meanwhile, cross-appeal the trial court's ruling that DV5 is not protected under the PSA. The parties do not dispute that *Christy* alone controls the discoverability of DV1, DV3, DV4, DV12 and DV13, although plaintiffs request that we independently examine those documents and review the trial court's specific rulings concerning their contents. Further, plaintiffs do not dispute the court's finding that DV6 is presumptively shielded under *N.J.S.A.* 2A:84A–22.8, but suggest it may be discoverable under the exceptional circumstances concept recognized in *Christy*.

With our permission, the New Jersey Hospital Association ("NJHA") has participated as an amicus curiae, generally in support of defendants' legal arguments on the interpretation of the PSA, while the New Jersey Association for Justice ("NJAJ") has participated as amicus curiae in support of plaintiffs' statutory interpretation. The Attorney General has also appeared in this matter to defend the constitutionality of the PSA.[16]

## III.

Since its enactment in 2004, the PSA has not been interpreted in any published opinion. We granted leave to appeal after the remand proceeding in this case at the urging of all of the parties and the amici. They seek not only review of the trial court's document-specific rulings but also general appellate guidance

---

sentations of defense counsel that the passage did not contain factual material. We have reviewed the transcript of that sealed proceeding as part of our consideration of the entire record.

[16] Both amici and the Attorney General took part in the remand proceedings.

about the proper interpretation of the PSA and its relationship with other law, including *Christy.*

"The objective of all statutory interpretation is to discern and effectuate the intent of the Legislature." *Murray v. Plainfield Rescue Squad,* 210 *N.J.* 581, 592, 46 *A.*3d 1262 (2012) (citing *Allen v. V & A Bros., Inc.,* 208 *N.J.* 114, 127, 26 *A.*3d 430 (2011)). We must first consult the statute's actual terms, ascribing to those words "their ordinary meaning and significance[.]" *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005). The words within the statute are not read in isolation, but instead must be read "in context with related provisions[,] so as to give sense to the legislation as a whole[.]" *Ibid.* Where the words of the statute are ambiguous, a court may consider extrinsic materials as a guide to their meaning, such as legislative history contained in sponsor statements and committee reports. *Burns v. Belafsky,* 166 *N.J.* 466, 473, 766 *A.*2d 1095 (2001). The court also should be guided by the objectives that the Legislature sought to achieve when enacting the statute. *LaFage v. Jani,* 166 *N.J.* 412, 431, 766 *A.*2d 1066 (2001).

 Because the meaning of legislation is a question of law, we review de novo the trial court's interpretation of the PSA. *Murray, supra,* 210 *N.J.* at 584, 46 *A.*3d 1262; *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995). However, we accord substantial deference to the factual determinations made by the trial court in assessing the credibility of the witnesses who testified at the remand hearings. *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.,* 65 *N.J.* 474, 483–84, 323 *A.*2d 495 (1974).

A.

The critical issue of statutory interpretation posed by the parties and the amici concerns the precise relationship between the confidentiality provisions in the PSA and the common-law qualified privilege set forth in *Christy.* In particular, the parties sharply differ on the intended meaning of subsection (k) of

*N.J.S.A.* 26:2H–12.25, which declares that "[n]othing in [the PSA] shall be construed to increase or decrease the discoverability, in accordance with *Christy*[,] ... of any documents, materials or information if obtained from any source or context other than those specified in [the PSA]." *See also N.J.S.A.* 26:2H–12.25(h) (similarly stating, without citation to *Christy,* that the PSA "shall not be construed to increase or decrease, in any way, the availability, discoverability, admissibility, or use of any such documents, materials, or information [that may have been considered in a self-critical analysis] if obtained from any source or context other than those specified in [the PSA]").

Plaintiffs and the NJAJ argue that the Legislature intended that any internal documents or communications generated within a health care facility pursuant to the PSA are protected only by a qualified privilege. They assert that any information or analyses developed by the facility in accordance with the PSA are still subject to potential disclosure under the criteria of *Christy.* In particular, they argue that a court, following an *in camera* review of the contested items, must order disclosure of any "purely factual," non-evaluative portions of those items. *See Christy, supra,* 366 *N.J.Super.* at 544, 841 *A.*2d 937.

Plaintiffs and the NJAJ further contend that, pursuant to *Christy,* the court also must order disclosure of "specific deliberative information, which might lead to discovery of critical evidence," if plaintiffs show a "compelling need" for such deliberative material. *Ibid.* Citing aspects of the PSA's legislative history and the words of subsection (k), plaintiffs and the NJAJ maintain that the statute was not intended to limit their access to internal communications that were previously accessible under *Christy.* They particularly stress the importance of allowing continued access to factual information, arguing that the PSA does not alter the general notion that no litigant or institution "owns" the facts of a case.

Defendants and the NJHA present a markedly different interpretation. They acknowledge that the PSA does not affect, as

subsection (k) indicates, the discoverability of "documents, materials or information if obtained from any source or context other than those specified in [the PSA]." *N.J.S.A.* 26:2H–12.25(k). However, they contend that the PSA was designed to shield information and analyses that are specifically generated in accordance with the PSA in the aftermath of a potential adverse event.

In this regard, defendants and the NJHA stress the legislative findings set forth in *N.J.S.A.* 26:2H–12.24. Those findings express clear policy objectives to provide greater incentives for health care professionals and staff to disclose mishaps and perceived risks to patient safety, and to encourage confidential discussion and analysis of what may have gone wrong and how such adverse outcomes might be prevented in the future. Defendants and the NJHA argue that conditioning the confidentiality of PSA-generated items upon the balancing criteria of *Christy* is in conflict with those policy objectives. They maintain that if information or documents are developed exclusively through the PSA process, such items are not subject to a *Christy* analysis but instead are protected by an absolute privilege.

Having considered these well-presented arguments, we adopt defendants' interpretation of the statute, subject to certain caveats.

1.

The PSA plainly does more than, as plaintiffs and the NJAJ essentially argue, codify our opinion in *Christy*. The policy imperatives reflected in the PSA's statutory history and legislative findings bespeak a strong commitment to address the "serious under-reporting" of adverse patient events. *N.J.S.A.* 26:2H–12.24(e). The Legislature also committed to establish "an environment that ... mandates the *confidential* disclosure of the most serious, preventable adverse events, and also encourages the voluntary, anonymous and *confidential* disclosure of less serious adverse events, as well as preventable events and near misses[.]" *N.J.S.A.* 26:2H–12.24(f) (emphasis added). These objectives, and the statute's repeated emphasis on confidentiality, cannot be rec-

onciled with plaintiffs' claim that the PSA's non-disclosure protections must yield to the exceptions set forth in *Christy*.

The chronology of the PSA's passage does not support plaintiffs' theory that the statute simply codifies *Christy*. The original bill that became the PSA, S–557, was introduced in the Senate on January 13, 2004, more than a month before our court coincidentally decided *Christy* on February 17, 2004. The bill's sponsors undoubtedly had an independent impetus for the legislation, which preceded *Christy*. Indeed, it appears that our published decision in *Christy* was an unanticipated development, at least in the Legislature, and that the statute's rather unusual inclusion of a legal citation to *Christy* in subsection (k) was an eleventh-hour attempt by the legislators to deal with the brand-new case law. By inserting the reference to *Christy* into the Act, the Legislature appears to have adopted a dual approach, i.e., (1) treating materials exclusively developed under the PSA as subject to the PSA's specific confidentiality terms; and (2) treating other internal materials that are not exclusively developed under the PSA pursuant to the residual common-law standards set forth in *Christy* or other law.

Plaintiffs' contention that the PSA does not provide independent confidentiality protection to factual information is undercut by the plain language of the statute itself. Subsections (f) and (g) of *N.J.S.A.* 26:2H–12.25, the Act's key confidentiality provisions, explicitly cover "information" as well as "documents" and "materials." The regulations that have since been adopted by the State likewise extend confidential protection to, among other things, "information" developed pursuant to the PSA. *N.J.A.C.* 8:43E–10.9(a), (b); *see also N.J.A.C.* 8:43E–10.10 (authorizing interagency sharing and use of confidential "information").

"Facts" are undoubtedly a form of "information." Plaintiffs and the NJAJ have not shown otherwise, and we find their reliance on portions of the legislative history to support their position unpersuasive. On this point, we are guided by the plain language of the

statute, and its explicit references to "information," rather than to extrinsic sources, as there is no ambiguity in that term.

■ We therefore hold that the PSA extends absolute confidential protection to all "documents, materials and information" developed exclusively by a health care facility through the PSA process. *N.J.S.A.* 26:2H–12.25(f), (g). If, however, such items have been created or developed through some other "source or context," then they are obtainable under the criteria governing such alternative situations. *N.J.S.A.* 26:2H–12.25(h), (k). Thus, if a participant in the PSA process obtains facts or opinions from other sources or contexts, such as peer-review material from the facility's continuous quality improvement program, those facts or opinions are not transformed into inaccessible "PSA materials." Instead, disclosure of the facts or opinions from such other sources may be sought under the relevant non-PSA criteria, including, where applicable, *Christy.*

■ The confidentiality of a particular fact or opinion under the PSA therefore hinges upon an exclusivity test, requiring the court to consider whether the item was developed solely under the procedures set forth in the PSA, or whether the item had an independent genesis. At times, that genesis may be obvious. At other times, it might not, and would require closer scrutiny of how each particular fact or opinion was created.

■ This exclusivity approach is reflected in the PSA regulations. As *N.J.A.C.* 8:43E–10.9(b) instructs:

(b) Documents, materials, and information (including RCAs and minutes of meetings) developed by a health care facility *exclusively* during the process of self-critical analysis, in accordance with *N.J.A.C.* 8:43E–10.4, 10.5 or 10.6 concerning preventable events, near-misses and adverse events, including serious preventable adverse events, and any document or oral statement that constitutes the disclosure provided to a patient or resident or the patient or resident's family member or guardian, in accordance with *N.J.A.C.* 8:43E–10.7, as well as the entry in the medical record related to such disclosure, shall not be:

1. Subject to discovery or admissible as evidence or otherwise disclosed in any civil, criminal or administrative action or proceeding; or

2. Used in an adverse employment action or in the evaluation of decisions made in relation to accreditation, certification, credentialing or licensing of an individual, which is based on the individual's participation in the development, collection or reporting or storage of information in accordance with *P.L.* 2004, *c.* 9 (*N.J.S.A.* 26:2H–12.23 through 12.25).

[Emphasis added.]

The DHSS's (now the DOH's) reasonable interpretation of the PSA, as the primary regulatory agency responsible for the statute's statewide implementation, is entitled to substantial judicial deference. *See In re Election Law Enforcement Comm'n Advisory Op. No. 01–2008,* 201 *N.J.* 254, 262, 989 *A.*2d 1254 (2010).

2.

■ Our construction of the PSA is subject to certain caveats. To retain the confidentiality protections afforded by the PSA, the health care facility must adhere to the requirements of the statute and the associated regulations.

The PSA is a detailed statute. Its confidentiality provisions are not expressed in a vacuum. Rather, the confidentiality provisions are incorporated within a larger, integrated framework. That framework includes a mandate that health care facilities adopt a patient safety plan with various enumerated components. *N.J.S.A.* 26:2H–12.25(b). The Act extensively delineates how the various kinds of "adverse events" and "near misses" are to be handled within the organization. In the implementing PSA regulations, the State has further specified those requirements. *See generally N.J.A.C.* 8:43E–10.1 to –10.11 (containing the regulations); *N.J.A.C.* 8:43E–10 Appendices A and B (containing model forms). Consequently, the confidential treatment extended by the PSA to certain internal documents of a health care facility must be conditioned upon the facility adhering to those requirements.

■ We also underscore that nothing in the PSA insulates the underlying facts relating to a patient mishap, if those facts can be learned from an independent source. For example, if counsel for a medical malpractice plaintiff deposes employees within the hospital having personal knowledge about a patient's care, those witnesses cannot refuse to answer factual questions because those

same facts also had been made known to the hospital's patient safety committee.[17] Instead, what the PSA guards against is the disclosure of communications made within the PSA process itself, including the self-critical and deliberative analyses that are undertaken by a patient safety committee.

Defendants and the NJHA appear to accept these basic propositions. They are only attempting in this case to safeguard the PSA process itself, and not otherwise shield underlying facts from disclosure and scrutiny if they can be ascertained from other sources. *See N.J.S.A.* 26:2H–12.25(h), (k).

Another important caveat to bear in mind is that our construction of the PSA is not an invitation to health care providers to shield information that was previously accessible under *Christy* or under other law by indiscriminately labeling such formerly accessible items as "PSA material." Nor does the law allow a health care facility to evade the limitations of *N.J.S.A.* 26:2H–12.25(h) and (k) by giving job titles to hospital personnel such as "PSA officers" when, in fact, they are performing functions that are not truly covered by the PSA. What matters for judicial review is the actual functions and activities involved, rather than the nomenclature adopted by the health care facility. *See Times of Trenton Publ'g Corp. v. Lafayette Yard Cmty. Dev. Corp.,* 183 *N.J.* 519, 535, 874 *A.2d* 1064 (2005) (noting that it is improper to "elevate form over substance" in a manner that would subvert the meaning of a statute).

## B.

We now apply these governing principles interpreting the PSA to the present record, including the trial court's post-remand

---

[17] However, if the hospital employee's knowledge about an incident stems solely from what he or she learned during the course of a PSA process, then the privilege applies. In addition, if documents, materials or information are developed originally through the PSA process but then voluntarily disseminated within the hospital thereafter for a non-PSA use (such as a quality assurance program or for peer review), then the item is subject to potential disclosure under the laws and standards that pertain to non-PSA items.

rulings denying disclosure of DV2 and granting partial disclosure of DV5.[18] Based upon our analysis, we reverse as to DV2 and affirm as to DV5. We conclude that neither of those two documents warrant the PSA's confidentiality protection, given the nature of those documents and the manner in which they were generated in the circumstances of this case.

1.

DV2, as we have noted, is a memorandum dated June 1, 2007 from Mutter, the Patient Safety Director, to Malkin, the head of Risk Management. The memorandum consists of three pages. It reflects the so-called "round-table" meeting that Mutter organized and led concerning the events of C.A.'s delivery. The meeting was attended by ten other individuals, several of whom were nurses. As we have noted, none of the persons at the meeting were physicians. Mutter summarized the information discussed at the meeting in his memorandum and then transmitted it to Malkin. The memorandum was not sent to the Patient Safety Committee.

Following the round-table meeting, and the transmittal of DV2 to Malkin, she, Mutter and Robles decided that the circumstances of C.A.'s birth did not involve the kind of an event that needed to be reported to the Patient Safety Committee. The three officials did not consult the physician who chairs the Hospital's Patient Safety Committee in making their decision. For that matter, the record suggests that the trio did not speak with any physician at or after the round-table meeting in reaching their joint determination that this incident did not need to be reported to the Patient Safety Committee. Mutter and Malkin testified that they each thought the situation did not involve an "adverse event." The testimony of Robles, on the other hand, suggests that she believed

---

[18] We have independently reviewed the contents of DV2 and DV5, which were appropriately furnished to us on appeal under seal. We discuss these sealed materials in our opinion in a manner that does not divulge contents to plaintiffs that they do not already have.

that the situation involved an adverse event, but that it was not "preventable."

There are several major problems with the process that led to the creation of DV2. First, the absence of any physicians participating in the round-table discussion, and in the decision by Malkin, Mutter and Robles to treat C.A.'s birth as a non-reportable event, runs counter to the PSA's statutory framework. *N.J.S.A.* 26:2H–12.25(b)(2) requires a patient safety plan to include, at a minimum, "a process for teams of facility staff ... to conduct ongoing analysis and application of evidence-based patient safety practices in order to reduce the probability of adverse events[.]" Such teams also are to "conduct analyses of near-misses, with particular attention to serious preventable adverse events *and adverse events*[.]" *N.J.S.A.* 26:2H–12.25(b)(3) (emphasis added). The Act specifies that such teams be "comprised of personnel who are representative of the facility's *various disciplines* and [who] have *appropriate competencies*[.]" *Ibid.* (emphasis added).

The present case involves allegations that C.A. became brain-damaged because she was deprived of oxygen at birth due to a combination of both physician error (in Dr. Bentolila going forward with a vaginal delivery, and in Dr. Chu supposedly attempting to resuscitate C.A. in a negligent manner and not promptly notifying an anesthesiologist of the malfunctioning intubation tube) and nurse error (in supposedly failing to detect and report the infant's breech position). In this context, the "various disciplines" implicated by this case include physicians as well as nurses. Consequently, the "appropriate competencies" of the reviewing team members under the PSA in this case should have included at least one physician. *N.J.S.A.* 26:2H–12.25(b)(2), (3). In fact, the "peer reviewers" arranged by Robles to evaluate this matter were both physicians—a pediatrician and an obstetrician.

Although one or more physicians possibly may have provided written background information or reports that were considered at the round-table meeting, no doctor was literally at the table. That shortcoming weighs against affording the round-table discussion

PSA confidentiality, at least in the context of this case that includes allegations of physician error. We do not hold that a physician must participate in every decision about whether to classify an adverse event as reportable under the PSA, but that, in the particular circumstances of this case, a physician's involvement as a reporting decision-maker was required.

Also problematic is Mutter's admission that, in essence, a "root cause analysis" was undertaken during the round-table discussion. Among other things, *N.J.A.C.* 8:43E–10.4(d)(7) requires patient safety committees to "assemble an appropriate team to conduct a root cause analysis of every serious preventable adverse event, as well as at least one root cause analysis per year of a preventable adverse event that is not subject to mandatory reporting or of a near-miss[.]" In addition, each patient safety committee is to "review the results of *each* root cause analysis[.]" *N.J.A.C.* 8:43E–10.4(d)(7)(ii) (emphasis added). That did not happen here.

The Hospital's Patient Safety Committee was never informed of this matter, nor of the conclusions from the round-table discussion, except as part of aggregate data. There is no documentation in the record that the Patient Safety Committee delegated to Mutter, Malkin and Robles the authority to perform a root cause analysis in this case. We do not believe the PSA was intended to operate in this fashion.

The seemingly dissonant conclusions that were reached, respectively, by Mutter, Malkin and Robles about the basis for the event's supposed non-reportability also raise concern. The conclusion of Mutter and Malkin that C.A.'s birth was not an "adverse event" does not inexorably comport with the PSA's broad definition of an "adverse event," encompassing "a negative consequence of care that results in unintended injury or illness[.]" *N.J.S.A.* 26:2H–12.25(a). As the trial judge's opinion indicates, there is a substantial and reasonable basis to conclude that C.A.'s brain damage following her delivery satisfies that broad definition. Moreover, Robles's apparent conclusion that the situation was an adverse event, but not a "preventable" one, also is debatable. The

record does not justify why this matter was not at least treated as a potential "serious preventable adverse event," which called for review by the Patient Safety Committee. *See N.J.A.C.* 8:43E–10.4(d)(7). We emphatically agree with the trial judge's observation that this matter should have been referred to the Patient Safety Committee to make these ultimate assessments of reportability.

Furthermore, the record does not clearly establish that the round-table meeting that generated DV2 was exclusively conducted pursuant to the procedures under the PSA. The record reflects that Mutter wore two hats. In addition to his role as Patient Safety Director, Mutter was also responsible for conducting factual investigations under the continuous quality improvement program. *N.J.A.C.* 8:43G–27.1 to –27.6. He could not effectively explain on cross-examination how he distinguished investigations under the PSA from the continuous quality improvement program. Materials from the latter are subject to potential disclosure under *Christy.* This blurring of Mutter's functions and responsibilities further weakens defendants' claim of PSA protection for DV2.

As we have noted, the trial judge specifically found that the Hospital did not act in full compliance with the processes and procedures of the PSA. Nevertheless, the judge found that DV2 was generated in "substantial compliance" with the Act. We do not embrace that generous assessment. Even if we did, we cannot justifiably sustain the decision to withhold DV2 from plaintiffs. That document should have been released, under the circumstances of this case.

We recognize that the PSA has certain gaps and ambiguities, and that the implementing regulations were not adopted by the State until after the creation of DV2. We also appreciate the lack of any reported case law construing the statute. The Hospital exhibited its confusion about the PSA in this very litigation by first asserting other privileges and not invoking the PSA; then arguing, after the trial court's initial *in camera* review, that all of the withheld documents were protected by the PSA; and ultimate-

ly arguing on remand that only DV2 and DV5 are covered by the PSA. Despite the confusion, plaintiffs should not be denied relief in the face of the Hospital's numerous departures from the requirements of the PSA.

The Hospital improperly allowed three non-physicians to keep this case out of the view of the Patient Safety Committee, which was formed for the very purpose of evaluating such negative patient outcomes. Although the PSA's confidentiality protections extend to "any person who performs responsibilities *for* or participates *in* meetings of the patient . . . safety committee[,]" *N.J.A.C.* 8:43E–10.9(c) (emphasis added), there is no justification in this case to extend that protection to the unilateral decision-making of Mutter, Malkin, and Robles. The fact that those three individuals were members of the Patient Safety Committee does not mean that they could exercise the authority of the Committee as a whole, particularly in a matter such as this implicating physician error.

We reject the suggestion that it would have been impractical to consult or involve the full Patient Safety Committee in this matter. To be sure, the regulations only require a patient safety committee to convene "at least quarterly[.]" *N.J.A.C.* 8:43E–10.4(c)(6). We are also mindful that the regulations only afford the patient safety committee five business days to report a confirmed serious preventable adverse event to the Department. *N.J.A.C.* 8:43E–10.6(b). But the regulatory scheme does not limit a patient safety committee's purview to consider only such most severe events. In fact, the stated purposes of a patient safety committee, as noted in the regulations, include the responsibility to "conduct analyses of *near-misses and adverse events* that occur within the facility, paying particular [but not exclusive] attention to serious preventable adverse events." *N.J.A.C.* 8:43E–10.4(b)(3) (emphasis added).

It was a fundamental mistake here to keep the Patient Safety Committee out of the loop, particularly given the absence of any physician at Mutter's round-table meeting and the lack of involvement of a physician in the ensuing undocumented decision to deem

the situation non-reportable. Indeed, the Act is designed not only to encourage the internal reporting of patient calamities, but also to assure that such instances are carefully reviewed by qualified professionals who can decide if corrective measures are needed. *See N.J.S.A.* 26:2H–12.25(b)(2), (3).

If the Hospital's system as described in this record were endorsed as a model, then a small group of non-physicians in each facility could intercept reports of nearly every questionable patient mishap. That group could then classify the matters—rightly or wrongly—as not comprising "serious preventable adverse events," and thereby keep them out of view of the Patient Safety Committee. That is not what the PSA intends.

Although we accept the trial court's finding that the Hospital acted in good faith, and we also appreciate the need for some preliminary screening, the analytic and decision-making functions performed by Malkin, Mutter, and Robles in this case were too excessive and not in keeping with the Act. We trust that the DOH will provide regulatory guidance and oversight to hospitals and other medical facilities in the future, so as to assure that their internal processes are in conformity with the PSA and the implementing regulations.

These considerations lead us to reverse the trial court's ruling to treat DV2 as confidential under the PSA. The upshot of our reversal is to place DV2 within the common-law analysis called for under *Christy*. Rather than remand this case a second time, we exercise our original jurisdiction pursuant to *Rule* 2:10–5 and conclude that DV2 in its entirety should be turned over to plaintiffs for use in this litigation. DV2 is essentially a factual document, thereby satisfying *Christy's* disclosure test. We discern no significant prejudice to defendants, nor any unjustified departure from the goals of the PSA, by providing these plaintiffs with such access to that specific exhibit. To deserve the protection of the PSA, a medical facility must adhere to it with care.

## 2.

Turning to DV5, we agree with the trial judge's conclusion that the document is not privileged under the PSA. DV5 is a two-page June 20, 2007 memorandum from Malkin, the risk manager, to four staff members, whom she met with three days earlier. The trial judge concluded that DV5 was a "risk management" document, not a PSA document, and that it was not generated within the PSA's procedures. Consequently, the judge assessed the discoverability of DV5 under the common-law standards of *Christy*. Applying those standards, the judge redacted the substantive contents of DV5, except for the document's address, date, and subject line. The judge did so because DV5 is deliberative and subjective in nature rather than factual.

We fully adopt the trial judge's ruling as to DV5. We agree that the document is outside the absolute privilege of the PSA. Nevertheless, it is a non-factual, subjective document that fails to meet an exception under *Christy*. The judge's decision as to DV5 was legally sound and sensible, and we hereby affirm it.

## 3.

Lastly, we affirm the trial court's item-by-item privilege dispositions concerning the contested documents other than DV2 and DV5, including the various redactions made by the judge on DV3, DV4, DV12, and DV13. Even taking into account plaintiffs' asserted need for further disclosure, the court did not misapply its discretion, nor the applicable law, in making these determinations. *See Payton v. N.J. Tpk. Auth.*, 148 *N.J.* 524, 559, 691 *A.*2d 321 (1997) (noting the deference we must give on appeal to such document-specific rulings by a trial judge involving claims of privilege).

## IV.

The final issue before us, which requires only limited discussion, is the argument of plaintiffs and the NJAJ that the PSA's confidentiality provisions represent an unconstitutional violation of

the separation of powers doctrine. Their argument is based on the fact that the PSA established an evidentiary privilege without the involvement of the judicial branch of government, and outside the collaborative legislative-judicial process specified in the Evidence Act of 1960, *N.J.S.A.* 2A:84A–33 to –44. We decline to invalidate the PSA on this basis.

We recognize that under article VI, section 2, paragraph 3 of the New Jersey Constitution, the Supreme Court is vested with plenary authority over procedural rules governing the courts in this state. *N.J. Const.* art. VI, § 2, ¶ 3; *accord Byrd, supra,* 198 *N.J.* at 343, 967 *A.*2d 285; *George Siegler Co. v. Norton,* 8 *N.J.* 374, 381, 86 *A.*2d 8 (1952); *Winberry v. Salisbury,* 5 *N.J.* 240, 245–46, 74 *A.*2d 406, *cert. denied,* 340 *U.S.* 877, 71 *S.Ct.* 123, 95 *L.Ed.* 638 (1950). Rules of evidence, however, have not been strictly classified in New Jersey as being either singularly procedural or substantive. *Byrd, supra,* 198 *N.J.* at 344, 967 *A.*2d 285; *see also Busik v. Levine,* 63 *N.J.* 351, 367, 307 *A.*2d 571 (noting that evidence rules may contain elements of both procedural and substantive law), *appeal dismissed,* 414 *U.S.* 1106, 94 *S.Ct.* 831, 38 *L.Ed.*2d 733 (1973). Thus, the adoption of evidence rules in New Jersey is governed by the Evidence Act, "and the process of adopting such rules involves all three branches of government." *Byrd, supra,* 198 *N.J.* at 342, 967 *A.*2d 285. Although " '[t]he Supreme Court may adopt rules dealing with the admission or rejection of evidence,' ... those procedures require participation by the Legislature and Governor[.]" *Ibid.* (quoting *N.J.S.A.* 2A:84A–33).

The parties, the amici, and the Attorney General do not dispute that the Legislature, in enacting the PSA, did not follow the procedures for adopting new evidence rules prescribed by the Evidence Act. *See N.J.S.A.* 2A:84A–34 to –36 (authorizing the Judicial Conference to consider a draft of new evidence rules); *N.J.S.A.* 2A:84A–38 (permitting the Court at any time and without presentation to a Judicial Conference, to submit proposed evidence rules to the Legislature for approval by joint resolution, and to the

Governor for his signature); *Byrd, supra,* 198 *N.J.* at 342–43, 967 *A.*2d 285 (describing the procedures required under the Evidence Act).

However, the Legislature has codified other evidentiary privileges in the past without the Judiciary's involvement. *See, e.g.,* Practicing Psychology Licensing Act, *L.* 1966, *c.* 282, § 28 (codified as amended at *N.J.S.A.* 45:14B–28) (creating the psychologist-patient privilege); Practicing Marriage and Family Therapy Act, *L.* 1968, *c.* 401, § 29 (codified as amended at *N.J.S.A.* 45:8B–29) (creating the marriage-counselor privilege).

Given this backdrop of constitutional and legal history, we decline to pronounce the confidentiality provisions in the PSA an invalid exercise of legislative power. Moreover, we agree with the trial judge that the ultimate assessment of this constitutional question is best reserved to the Supreme Court, as the final arbiter of the boundaries among our three branches of State government. *See generally Commc'ns Workers of Am., AFL–CIO v. Florio,* 130 *N.J.* 439, 617 *A.*2d 223 (1992) (resolving a separation of powers controversy).

## V.

For the foregoing reasons, we reverse the trial court's decision that deems DV2 confidential under the PSA, and order that DV2 shall be turned over in its entirety to plaintiffs' counsel. Our ruling in this regard is stayed for thirty days; if defendants file a petition for certification, the stay shall continue in effect unless and until the Supreme Court otherwise directs. We affirm the trial court's separate ruling withholding the non-factual portions of DV5, pursuant to *Christy.* We also affirm the trial judge's rulings with respect to the remaining contested documents.

Affirmed in part, reversed in part, and remanded to the Law Division for the completion of discovery [19] and trial.

---

[19] The trial court shall have the discretion to extend factual and expert discovery, as may be warranted in light of the disclosure of the contents of DV2 to plaintiffs, which we have ordered.